# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-18-00569-CR

---

**Kevin Ratliff, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 424TH DISTRICT COURT OF LLANO COUNTY
NO. CR7557, THE HONORABLE EVAN C. STUBBS, JUDGE PRESIDING**

---

## O P I N I O N

Kevin Ratliff was charged with two counts of official oppression and with one count of tampering with a governmental record. *See* Tex. Penal Code §§ 37.10, 39.03. For the tampering offense, the jury charge included instructions for a state-jail felony offense as well as a lesser-included misdemeanor offense. Prior to trial, Ratliff elected to have the district court assess his punishment if the jury found him guilty. At the end of the guilt-or-innocence phase, the jury found Ratliff guilty of the two counts of official oppression and of the lesser misdemeanor offense of tampering with a governmental record. At the end of the punishment hearing, the district court sentenced Ratliff to six months' confinement in the county jail, suspended those sentences, and placed Ratliff on community supervision for one year for all three offenses and rendered its judgments of conviction. *See id.* § 12.21. In three issues on appeal, Ratliff challenges the sufficiency of the evidence supporting his convictions and argues

that there was error in the jury charge. We will affirm the district court's judgments of conviction.

## BACKGROUND

Ratliff was charged with official oppression and with tampering with a governmental record (a police offense report) following the arrest of Cory Nutt. The undisputed evidence presented at trial established that Ratliff was the chief of police for the City of Llano, Texas, and that Nutt was living at Riverway RV Park on the night in question and was socializing outside with his neighbor Alex Britton. While Nutt and Britton were outside, one of their neighbors—Officer Matthew Harden—responded to an emergency call in his personal vehicle. Although the nature of the exchange between Nutt and Officer Harden is disputed, it is not disputed that Nutt communicated his belief that Officer Harden was driving too fast and that Officer Harden responded to Nutt's comments before leaving the neighborhood and driving to the emergency call.

After responding to the emergency call, Officer Harden drove back to Nutt's trailer home more than half an hour later. While Officer Harden was at Nutt's home, he asked for additional backup officers, and Officers Aimee Shannon and Jared Latta and Ratliff all responded to the request. The events that occurred before and after the other officers arrived form the basis for this appeal.

During the trial, an approximately fourteen-minute recording from Officer Shannon's body camera was played for the jury. At the start of the recording, an individual later identified as Nutt is shown standing inside his home without his shoes on. The recording also shows that Nutt's outward opening front door is open and that there is a short set of stairs from the front door to the ground. Initially, Nutt is interacting with individuals later identified as

2

Officers Harden and Shannon, but Ratliff appears on the recording later. During Officers Harden and Shannon's exchange with Nutt, the officers repeatedly order Nutt to step outside his home, but Nutt tells the officers to leave his property, asks the officers to release his front door so that it may close, states that he is not going to step outside his home, communicates that he only opened his door because the police were knocking on it, and informs the officers that they cannot come inside his property.

In response, Officer Harden tells Nutt that he saw Nutt "out here intoxicated" earlier, that Nutt committed that offense twice, that Nutt cursed at Office Harden and directed him "to get out of [his] truck," and that Nutt "quickly scurried into [his] trailer and shut [his] door." Additionally, Officer Harden states that "this is gonna go bad for" Nutt, that Nutt will be going to jail if Officer Harden has "to come up there," and that Nutt will lose his "high paying job . . . with the LCRA." Next, Officer Harden threatens to call Nutt's supervisor, states that he will come up the stairs to "get" Nutt if Nutt did not step outside, and relates that Nutt will be facing a charge of resisting arrest if Officer Harden has to fight him. When discussing their earlier encounter before Officer Harden returned, Officer Harden denies speeding but says that Nutt was "highly intoxicated in a public place" at that time, that Nutt refused to provide his name, and that by refusing, Nutt committed the offense of "[f]ailing to ID."

In addition, throughout the recording, Officer Shannon is shown aiming her flashlight at Nutt. Further, she asks Officer Harden if he had previously detained Nutt, and Officer Harden stated as follows: "No I couldn't when I opened—he told me he said 'Get on out, bitch' and . . . he ran inside and slammed the door" but did not lock it because he was too intoxicated. Officer Shannon tells Nutt that by not complying, he is resisting arrest and interfering "with public duties." Officer Shannon later tells Nutt to get his driver's license and

3

stated that if he did not, she would throw him "in jail for failure to ID. Things are stacking up." When Nutt attempts to retrieve his driver's license, Officer Shannon climbs the stairs and seemingly tries to get a better view of Nutt or of the inside of the home. At that point, Nutt briefly raises his hand, and Officer Shannon orders Nutt not to touch her and warns him that she will tase him if he touches her. Nutt denies touching her. Later, Officer Shannon clarifies that Nutt is facing charges for public intoxication. After several minutes and while Officer Harden is repeatedly ordering Nutt to step outside, Officer Shannon pulls out her taser, aims it at Nutt, and asks if he wants to get tased.

Around this time, Ratliff appears on the recording wearing a police uniform. Moreover, the recording shows Ratliff walking around Nutt, entering Nutt's trailer, placing his hands on Nutt's back, and directing Nutt forward out of the trailer while Nutt was saying that he did not want to leave his home. At this point, Officers Harden and Latta place Nutt in handcuffs.

After Nutt was arrested, he filed a complaint regarding the nature of his arrest and the conduct of the officers involved. Officer Jack Schumacher, who was the chief investigator for the district attorney's office, was assigned to investigate the allegations made by Nutt. As part of his investigation, Officer Schumacher interviewed Ratliff, and that interview was admitted as an exhibit and played for the jury.

On the recording of the interview, Ratliff admits that he read Officer Harden's offense report regarding the night in question. When describing that night, Ratliff states that he views the situation as "obviously a drunk guy that was refusing to come out after he went back in the trailer," that there would have been no problem if Nutt had not run back into his trailer, that he believes there was a legal basis to arrest Nutt, that Nutt "had no right to run back in the

4

trailer," and that he went inside Nutt's home because he "didn't want to see a 300 something pound guy get tased standing in the dooway[] and [then] fall[] face first."

A copy of the offense report prepared by Officer Harden was admitted as an exhibit and published to the jury. The report was signed by Officer Harden and contains Ratliff's initials as Officer Harden's supervisor. The report states that Nutt yelled expletives at Officer Harden as he responded to a request for backup, that Nutt was "speaking with slurred speech" and was "staggering heavily as he walked," that Officer Harden informed Nutt that he was a police officer and was responding to an "emergency," that Nutt refused to identify himself, that Officer Harden told Nutt to go inside his home, and that Officer Harden left to respond to the emergency. Next, the report relates that Officer Harden returned to Nutt's home, that Officer Harden attempted to learn Nutt's identity by having dispatch run the license plate numbers for his trailer and his truck, and that when dispatch relayed the name of the owner of the truck and trailer, Nutt stepped out of the shadows and told Officer Harden to "get out of the truck bitch." Lastly, the report reflects that Officer Harden concluded that Nutt was intoxicated in a public place and may have been "a danger to himself or others," that Officer Harden requested backup, that Nutt was arrested for a Class C misdemeanor of public intoxication, and that "Ratliff placed Nutt in handcuffs."

During the trial, the State called five witnesses to the stand. First, the State called Nutt and Britton to testify regarding their observations on the night in question. Next, the State called Christie Schutte to the stand. She was the manager for the Riverway RV Park and drove to Nutt's home on the night in question after receiving a phone call from Officer Harden. She arrived after Officer Harden but before the other police officers. Next, the State called Officer Schumacher, who testified regarding his investigation concerning the arrest of Nutt and his

5

opinion about the lawfulness of the actions of the police that night and later. Finally, the State called Officer Lisa Bujnoth, who had served in various law-enforcement agencies for decades, received training in the area of constitutional law, and provided testimony regarding, among other things, the lawfulness of the actions by the police officers involved in Nutt's arrest.

Once the parties rested, the district court provided the jury with a jury charge. The charge included instructions for two counts of official oppression, for one state-jail felony count of tampering with a governmental record, and for a lesser-included misdemeanor offense of tampering with a governmental record. After considering all the evidence presented at trial, the jury found Ratliff guilty of the two counts of official oppression and of the lesser-included offense of misdemeanor tampering with a governmental record.

Ratliff appeals all three of his convictions.

**DISCUSSION**

In his first two issues on appeal, Ratliff challenges the sufficiency of the evidence supporting his two convictions for official oppression and his conviction for tampering with a governmental record. We will address the sufficiency of the evidence pertaining to Ratliff's tampering conviction before addressing his official-oppression convictions. In his last issue on appeal, Ratliff contends that there was reversible error in the jury charge.

**Sufficiency of the Evidence**

Under a legal-sufficiency standard of review, appellate courts view the evidence in the light most favorable to the verdict and determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). When performing this review, an appellate court must bear in mind

6

that it is the factfinder's duty to weigh the evidence, to resolve conflicts in the testimony, and to make "reasonable inferences from basic facts to ultimate facts." *Id.*; *see also* Tex. Code Crim. Proc. art. 36.13 (explaining that "jury is the exclusive judge of the facts"). Moreover, appellate courts must "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007). Furthermore, appellate courts presume that conflicting inferences were resolved in favor of the conviction and "defer to that determination." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). In addition, courts must bear in mind that "direct and circumstantial evidence are treated equally" and that "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor" and "can be sufficient" on its own "to establish guilt." *Kiffe v. State*, 361 S.W.3d 104, 108 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd).

In reviewing the legal sufficiency of the evidence supporting a conviction, appellate courts consider "*all* evidence that the trier of fact was permitted to consider, regardless of whether it was rightly or wrongly admitted." *Demond v. State*, 452 S.W.3d 435, 445 (Tex. App.—Austin 2014, pet. ref'd) (emphasis added). The evidence is legally insufficient if "the record contains no evidence, or merely a 'modicum' of evidence, probative of an element of the offense" or if "the evidence conclusively establishes a reasonable doubt." *Kiffe*, 361 S.W.3d at 107 (quoting *Jackson*, 443 U.S. at 320). Furthermore, reviewing courts "measure the sufficiency of the evidence by the so-called hypothetically correct jury charge, one which accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant is tried." *See DeLay v. State*, 465 S.W.3d 232, 244

7

n.48 (Tex. Crim. App. 2014). "[W]hen multiple theories are submitted to the jury, the evidence is sufficient to support a conviction so long as the evidence is sufficient to support conviction for one of the theories submitted to the jury." *Guevara v. State*, 152 S.W.3d 45, 52 (Tex. Crim. App. 2004).

*Tampering with a Governmental Record*

As set out earlier, the jury charge included a lesser-included-offense instruction for misdemeanor tampering with a governmental record. Under the Penal Code, an individual commits that offense if, among other ways, an individual "makes, presents, or uses a governmental record with knowledge of its falsity." Tex. Penal Code § 37.10(a)(5). Moreover, the Penal Code defines a governmental record, in relevant part, as "anything belonging to, received by, or kept by government for information." *Id.* § 37.01(2)(A). Consistent with the Penal Code, the jury charge in this case specified that Ratliff was guilty of misdemeanor tampering if he "ma[d]e or present[ed] or use[d] a governmental record, namely [Officer Harden's] Llano Police offense report, . . . by omitting or misrepresenting facts of the arrest of . . . Nutt . . . with knowledge of [the report's] falsity."

On appeal, Ratliff asserts that the evidence is insufficient to support his conviction for tampering with a governmental record because the State did not provide any evidence regarding "what is required to be [included] in an offense report." Further, Ratliff argues that there is no statute requiring that a police officer fill out an offense report or that certain information be included in the report with the exception of incidents involving family violence. *See* Tex. Code Crim. Proc. art. 5.05(a). Instead, Ratliff asserts that the contents of an offense report are likely matters "of policy individualized to the department or office requiring

their employees to make them." Building on the preceding, Ratliff contends that there is no requirement that an offense report document anything other than the offense itself; that the report at issue did document the alleged offense of public intoxication; that the report did not need to document Nutt's actual arrest; that the report related to Nutt's conduct and, therefore, did not need to specify the basis for the offense that Ratliff was subsequently charged with; that there is no evidence that any statements relating to the offense of public intoxication "were either false or omitted from the report"; and that the State presented no evidence of any policy violation regarding the contents of the offense report or regarding a duty by Ratliff to "reject or require amendments to it." For these reasons, Ratliff contends that the statutory requirements could not be met and that the evidence is, therefore, insufficient to support his conviction.

As an initial matter, we note that even if there is no statute specifically requiring the preparation of an offense report or specifying the necessary items to include in that type of report, the definition for "governmental record" includes reports beyond those that are statutorily mandated. *See* Tex. Penal Code § 37.01(2). Additionally, Officer Bujnoth and Officer Schumacher both testified that offense reports are governmental records, and at least two of our sister courts of appeals have concluded that offense reports are governmental records as that term is defined in the Penal Code. *See Hernandez v. State*, 577 S.W.3d 361, 368 (Tex. App.— Houston [14th Dist.] 2019, pet. ref'd) (concluding that evidence was sufficient to support determination that offense report was governmental record); *Magee v. State*, No. 01-02-00578-CR, 2003 WL 22862644, at *2 (Tex. App.—Houston [1st Dist.] Dec. 4, 2003, no pet.) (mem. op., not designated for publication) (explaining that Penal Code's "broad definition of a governmental record . . . encompasses . . . police offense detail report").

Moreover, during the trial, Officer Bujnoth explained that "[t]he purpose of an offense report is to account in an incident for everything that happens from the beginning to the end . . . whether it's good or bad" because "the offense report is the first document that . . . the prosecuting attorney sees in order to determine what charges are appropriate, if any." *Cf. Wingo v. State*, 143 S.W.3d 178, 189, 190 (Tex. App.—San Antonio 2004) (noting officer's testimony that purpose of "an incident report is to accurately document a specific event or action" and that purpose was undermined when officer "did not accurately document the event"), *aff'd*, 189 S.W.3d 270 (Tex. Crim. App. 2006). Further, Officer Bujnoth testified that offense reports "should be very comprehensive" and "should include witnesses that may or may not have information, both for the prosecutor and for the defense." Similarly, Officer Schumacher testified that prosecutors rely on offense reports, in part, to determine what charges might be warranted and also to determine if the police engaged in any unlawful behavior that might result in evidence being suppressed. The testimony presented at trial and the report itself indicate that the report was prepared by Officer Harden in his role as a police officer, *see Hernandez*, 577 S.W.3d at 367, and Ratliff admitted during his interview with Officer Schumacher that he read the contents of Officer Harden's report. Additionally, the offense report itself contains Ratliff's initials in the "approving supervisor" blank.

Additionally, the evidence presented at trial, including the recording from Officer Shannon's body camera, established that Ratliff observed and participated in conduct leading to Nutt's arrest that was not mentioned in the report, and Officer Schumacher and Officer Bujnoth both testified that there were omissions in the offense report and discrepancies between what was in the report and what was captured on the recording from Officer Shannon's body camera. In particular, Officer Schumacher explained that there was no mention of the interaction between

10

Nutt and the officers while he was in his home, that there was no mention of Ratliff entering Nutt's home and escorting Nutt out without a warrant and without consent, and that there were no witnesses listed in the report even though "there were some civilians involved that witnessed the event," including Britton and Schutte, which Schumacher described as a "significant" omission. Officer Bujnoth provided similar testimony. More specifically, she explained that there were disparities between what occurred on the recording and what was listed in the offense report, including not listing any witnesses or mentioning that Officer Shannon pointed her taser at Nutt, which Officer Bujnoth described as a show of force that was required to be disclosed. In fact, Officer Bujnoth related that the omissions and misrepresentations were so great that they qualified as tampering with a governmental record.

Finally, Officer Schumacher testified that Ratliff signed the report as the supervisor and, therefore, approved the report, and Officer Bujnoth explained that by signing the offense report, Ratliff indicated that he read the contents, endorsed the description of the events on the night in question, and used the report to document the event.

Given our standard of review and in light of the record before this Court as well as all the reasonable inferences that can be made from that record, we must conclude that a rational jury could have concluded that when Ratliff affixed his initials to the offense report that contained omissions of events pertaining to the legality of Nutt's arrest that Ratliff himself witnessed, he made or used a governmental record knowing that the report was false. *See* Tex. Penal Code § 37.10(a)(5); *see also id.* § 6.03(b) (explaining that person acts knowingly "with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist"); *Hernandez*, 577 S.W.3d at

11

368 (determining that jury could have inferred that defendant police officer made false entry in offense report).

For these reasons, we overrule Ratliff's second issue on appeal.

*Official Oppression*

As set out above, Ratliff was convicted of two counts of official oppression. Under the relevant portions of the Penal Code, "[a] public servant acting under color of his office or employment commits" the offense of official oppression "if he . . . intentionally subjects another to mistreatment or arrest . . . that he knows is unlawful" or "intentionally denies or impedes another in the exercise or enjoyment of any right . . . knowing his conduct is unlawful." Tex. Penal Code § 39.03(a). Moreover, a "[p]ublic servant" is defined as "a person elected, selected, appointed, employed, or otherwise designated as . . . an officer, employee, or agent of government." *Id.* § 1.07(a)(41). The Penal Code also specifies that "'[g]overnment' means . . . the state; . . . a county, municipality, or political subdivision of the state; or . . . any branch or agency of the state, a county, municipality, or political subdivision." *Id.* § 1.07(a)(24). Further, the Penal Code states that "'[u]nlawful' means criminal or tortious or both and includes what would be criminal or tortious but for a defense not amounting to justification or privilege." *Id.* § 1.07(a)(48). The jury charge included these definitions and others in the abstract portion of the charge.[1]

---

[1] As will be discussed more thoroughly in the portion of the opinion addressing Ratliff's third issue, the jury charge also included an instruction that Llano police officers are public servants, and we ultimately conclude that this inclusion was error. However, the inclusion of that instruction does not bear upon our sufficiency analysis here because that instruction is not part of a hypothetically correct jury charge.

12

The jury charge also set out the circumstances in which an officer may arrest an individual without a warrant, and those instructions generally tracked the directives in the provisions of the Code of Criminal Procedure governing warrantless arrests. Under the Code of Criminal Procedure, a police officer may arrest without a warrant "persons found in suspicious places and under circumstances which reasonably show that such persons have been guilty of some felony, [disorderly conduct and related offenses], breach of the peace, or [public intoxication], or threaten, or are about to commit some offense against the laws." Tex. Code Crim. Proc. art. 14.03(a) (referencing chapter 42 and section 49.02 of Penal Code). In addition, the Code of Criminal Procedure also authorizes a police officer to arrest and pursue someone without a warrant "[w]here it is shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony has been committed, and that the offender is about to escape, so that there is no time to procure a warrant." *Id.* art. 14.04. Further, a police officer "may arrest an offender without a warrant for any offense committed in his presence or within his view." *Id.* art. 14.01(b).

For warrantless arrests, the Code of Criminal Procedure further clarifies that in circumstances in which an arrest "may be lawfully made without a warrant, the officer . . . making the arrest is justified in adopting all the measures which he might adopt in cases of arrest under warrant, except that an officer making an arrest without a warrant may not enter a residence to make the arrest unless" one of the following occurs:

(1) a person who resides in the residence consents to the entry; or

(2) exigent circumstances require that the officer making the arrest enter the residence without the consent of a resident or without a warrant.

13

*Id.* art. 14.05; *see also Silverman v. United States*, 365 U.S. 505, 511 (1961) (stating that at core of Fourth Amendment "stands the right of a man to retreat to his own home and there be free from unreasonable governmental intrusion").

Although the Code of Criminal Procedure does not specifically list what exigent circumstances authorize a police officer to enter a home without a warrant and without a resident's consent, appellate courts have explained that "exigent circumstances may require immediate, warrantless entry by police officers who are: '(1) providing aid or assistance to persons whom law enforcement reasonably believes are in need of assistance; (2) protecting police officers from persons whom they reasonably believe to be present, armed, and dangerous; [or] (3) preventing the destruction of evidence or contraband.'" *Cooksey v. State*, 350 S.W.3d 177, 185 (Tex. App.—San Antonio 2011, no pet.) (quoting *Gutierrez v. State*, 221 S.W.3d 680, 685 (Tex. Crim. App. 2007)). Moreover, courts have explained that exigent circumstances are present when there is an imminent risk of serious injury. *See Brigham City v. Stuart*, 547 U.S. 398, 403 (2006); *see also Shepherd v. State*, 273 S.W.3d 681, 684 (Tex. Crim. App. 2008) (noting that emergency doctrine allows police "to engage in conduct that would otherwise violate the Fourth Amendment" if they reasonably believe action is necessary to protect or preserve life). In addition, courts have also recognized that the hot or continuous pursuit of a suspect attempting to avoid arrest or detention is an exigent circumstance that authorizes a warrantless entry and arrest. *See Rue v. State*, 958 S.W.2d 915, 918 (Tex. App.—Houston [14th Dist.] 1997, no pet.).

Besides including instructions consistent with the law set out above, the jury charge also sets out the law pertaining to criminal trespass. Under the Penal Code, an individual commits the offense of criminal trespass if he "enters or remains on or in property of another . . .

14

without effective consent and the person . . . had notice that the entry was forbidden . . . or received notice to depart but failed to do so." Tex. Penal Code § 30.05(a). Notice, in this context, means, as relevant here, "oral or written communication by the owner or someone with apparent authority to act for the owner" or "fencing or other enclosure obviously designed to exclude intruders or to contain livestock." *Id.* § 30.05(b)(2). Further, the Penal Code states that "'[b]uilding' means any enclosed structure intended for use or occupation as a habitation" and that "'[h]abitation' means a structure or vehicle that is adapted for the overnight accommodation of persons." *Id.* § 30.01(1), (2). In addition, "a 'habitation' is a form of property that carries with it the highest degree of privacy" and "*inherently* provides notice that entry is forbidden." *Salazar v. State*, 284 S.W.3d 874, 878 (Tex. Crim. App. 2009).

Building on all of the preceding, the jury charge for the first count of official oppression instructed the jury to find Ratliff guilty if it determined beyond a reasonable doubt that Ratliff "was then and there acting under color of his office or employment as a public servant" and that he "did then and there subject . . . Nutt to arrest that the defendant knew was unlawful"; "did then and there, knowing his conduct was unlawful, intentionally deny or impede . . . Nutt in the exercise or enjoyment of a right, namely, his right not to be deprived of his liberty without due course of law, by detaining or seizing or arresting . . . Nutt"; or "did then and there, knowing his conduct was unlawful, intentionally deny or impede . . . Nutt in the exercise or enjoyment of a right, namely, his right to be secure in his person from all unreasonable seizures, by entering . . . Nutt's residence and seizing him without a warrant." Regarding the second count of official oppression, the jury charge instructed the jury that it should find Ratliff guilty if it determined "beyond a reasonable doubt" that Ratliff "did then and there, intentionally subject . . . Nutt to mistreatment that the defendant knew was unlawful, namely, criminally trespassing

15

upon . . . Nutt's residence" and that he "was then and there acting under color of his employment as a public servant."

When challenging the sufficiency of the evidence, Ratliff does not dispute that the evidence established that there was no warrant authorizing the arrest of Nutt, that Ratliff was a public servant, that he was acting under his authority as a public servant when he entered Nutt's home and facilitated his arrest, that Ratliff did not have Nutt's consent to enter his home, or that Nutt's home qualified as a habitation. Instead, Ratliff argues that the evidence did not establish that he knew that the arrest and entry were unlawful and that the evidence established that his otherwise impermissible conduct was justified by the presence of exigent circumstances and that the entry and arrest were authorized because he observed Nutt commit an offense.

*Exigent Circumstances*

In one set of arguments, Ratliff contends that the evidence is insufficient to support his official oppression convictions because the evidence established that he entered Nutt's home and fostered his arrest due to the exigent circumstances caused by Nutt's decision to flee from Officer Harden to avoid arrest. Moreover, Ratliff argues that the pursuit of Nutt by Officer Harden was never abandoned and that the pursuit "was both immediate and continuous."

When presenting these arguments, Ratliff notes that in Officer Harden's offense report, Officer Harden wrote that Nutt came out of the shadows when dispatch conveyed Nutt's identity and that Nutt subsequently went inside his home. Additionally, on the recording from Officer Shannon's body camera, Officer Harden stated that Nutt was outside of his home when Officer Harden returned to the scene and then ran into his home, and during Ratliff's interview

16

with Officer Schumacher, Ratliff made a similar statement indicating that Nutt had run into his home and had no right to avoid a legal arrest by running inside.

However, Ratliff also explained during his interview that he was not present when the second interaction started and that Nutt was already inside the trailer when Ratliff arrived. Moreover, Schutte—the manager for the RV park—testified that Nutt was inside the trailer when she arrived and that Officer Harden was asking dispatch to run Nutt's license plate number at that time. Schutte also related that she never observed Nutt run inside the trailer, that Officer Harden never mentioned to her that Nutt ran inside his home, that Officer Harden was not acting as though he was involved in an emergency situation, that Officer Harden admitted that Nutt was inside his home, that Officer Harden stated that he was going to arrest Nutt for public intoxication, and that she asked Officer Harden how Nutt could have committed that offense if he was inside his home. Next, Schutte recalled that Officer Harden walked away from her after dispatch was able to identify Nutt based on his license plate numbers, that Officer Harden then knocked on Nutt's door, and that Nutt opened the door to talk with Officer Harden. Further, Schutte related that Officer Harden apologized to her a few days later and stated that the situation "got out of hand and escalated beyond what it should have been" and that he was going to arrange for the charges against Nutt to be "dropped because he didn't expect every officer to show up there and it just [got] blown out of proportion."

In his testimony, Britton—Nutt's next-door neighbor—testified that he and Nutt went inside their respective homes after the first encounter with Officer Harden, that he heard knocking after they went inside, that he saw several cops outside, and that Nutt opened his front door to talk with the officers. Similarly, Nutt explained in his testimony that he went inside his

17

trailer after the first encounter with Officer Harden, took off his shoes, went to sleep, and was awakened by the sound of Officer Harden knocking on his front door.

Furthermore, Officer Schumacher testified that in performing his investigation in this case, he listened to a call from Officer Harden to dispatch in which he stated that he was calling about an individual who committed the offense of public intoxication, that the individual was "back in his trailer," and that Officer Harden was "going to wait for a unit." Additionally, Officer Schumacher testified that any potentially exigent circumstances dissipated when Officer Harden told dispatch that Nutt was in his trailer and, therefore, that the police were not in an immediate and continuous pursuit of an individual under lawful arrest. Accordingly, Officer Schumacher related that there were no exigent circumstances present in this case to justify the warrantless arrest.

Although there is conflicting testimony regarding whether Nutt was outside the home before Officer Harden knocked on the front door, given our standard of review, we must conclude that the jury resolved that conflict in favor of Ratliff's conviction by determining that Nutt went inside his trailer after the first encounter with Officer Harden and did not leave the home until he was forced out by Ratliff. *Cf. Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984) (concluding that "claim of hot pursuit [wa]s unconvincing because there was no immediate or continuous pursuit of the petitioner from the scene of a crime" and noting that exception should not apply when offense committed is minor in nature). Moreover, we note that when determining what weight to give to the conflicting evidence, the jury was aided by the contents of Officer Harden's report addressing the events in question, which omitted several events from the night in question, and from the body-camera recording capturing Nutt's interaction with the police officers and showing him without his shoes.

18

Accordingly, assuming that the continuous-pursuit exception could have applied in these circumstances, *see* Tex. Penal Code §§ 12.23, 49.02(c) (explaining that public intoxication "is a Class C misdemeanor" and that "Class C misdemeanor" is punishable by fine but not by jail time); *Waugh v. State*, 51 S.W.3d 714, 718 n.3 (Tex. App.—Eastland 2001, no pet.) (noting that officers may make warrantless entry into home if in hot pursuit of suspect who committed misdemeanor offense punishable by confinement in jail), the evidence presented at trial is legally sufficient to support the jury's determination that the exception did not apply in this case.[2]

---

[2] As support for his assertion that exigent circumstances justified the warrantless arrest in this case, Ratliff points to a recent opinion by one of our sister courts of appeals. *See Arrington v. State*, 589 S.W.3d 196 (Tex. App.—Houston [1st Dist.] 2019, pet. dism'd), *op. withdrawn on appellant's death,* No. 01-17-00859-CR, 2020 WL 619311 (Tex. App.—Houston [1st Dist.], Feb. 11, 2020, order). In that case, Arrington filed a motion to suppress evidence pertaining to his arrest for driving while intoxicated. *Id.* at 198. During the suppression hearing, evidence was presented that a concerned citizen called the police and followed Arrington after observing him drive in an erratic manner, that a police officer and the concerned citizen followed Arrington to his home, that another officer observed Arrington attempting to enter his home after standing behind an iron fence, that the officer ordered Arrington not to enter his house, and that the officer tased Arrington and then arrested him. *Id.* at 199-200. When affirming the trial court's order denying the motion to suppress, our sister court noted that although a law-enforcement officer may generally not enter a residence to make a warrantless arrest, "[t]he hot pursuit of an offender seeking to avoid arrest is an exigent circumstance justifying nonconsensual entry into the offender's residence" and explaining that Arrington "was not entitled to evade arrest by retreating to his home." *Id.* at 203-04.

We find that *Arrington* is distinguishable. The appeal in *Arrington* involved the review of a ruling on a motion to suppress and not the review of the sufficiency of the evidence. Additionally, the offense at issue in *Arrington* was driving while intoxicated, *id.* at 198, 202-03, which unlike public intoxication, carries the possibility of confinement as a potential punishment, *see* Tex. Penal Code §§ 12.22, 49.04. Moreover, even if exigent circumstances could authorize the warrantless arrest of a defendant engaging in behavior similar to that of Arrington to evade arrest for the offense of public intoxication, the jury could have reasonably inferred from the evidence that Nutt was in his trailer when Officer Harden returned to the property. *Cf. Arrington*, 589 S.W.3d at 201 (noting that "[t]here was an immediate and continuous pursuit of Arrington"). Further, by finding Ratliff guilty, the jury necessarily determined that exigent circumstances did not justify the warrantless arrest or entry into Nutt's

In the same set of arguments, Ratliff argues that the evidence is insufficient to establish that his actions were unlawful because the evidence established that his actions were justified by the exigent-circumstances exception authorizing police officers to protect individuals from a risk of serious injury.

As support for his assertion, Ratliff points to portions of his interview in which he told Officer Schumacher that Officer Shannon was about to tase Nutt when Ratliff arrived on the scene, that Nutt was standing in the doorway to the trailer several feet above the ground, and that Ratliff was concerned that Nutt would be injured if he were tased and fell out of his home. Moreover, Ratliff highlights testimony from Officer Schumacher explaining that exigent circumstances can justify a warrantless entry and that "tasers can be deadly" and from Officer Bujnoth stating that one type of exigent circumstance authorizing a warrantless entry "is the protection of life." Next, Ratliff refers to portions of the body-camera recording and notes that Officer Shannon asked Nutt if he wanted to be tased and aimed her taser at Nutt shortly before Ratliff entered the trailer and that Officer Harden warned Nutt that Officer Shannon was going to tase him. In light of the preceding, Ratliff urges that "[e]xigent circumstances existed authorizing [his] entry to the trailer in order to defuse the situation" and in order to prevent injury to Nutt and that, therefore, his warrantless entry and facilitation of Nutt's arrest were lawful.

As set out above, the evidence presented at trial supported a determination by the jury that Nutt was in his home when police officers knocked on his door, that Nutt was not fleeing from Officer Harden, and that, therefore, no legal basis existed for entering the trailer and arresting Nutt unless another exigent-circumstance exception applied. In light of the above, the

trailer when it determined that Ratliff's conduct was unlawful, and the jury's determination is supported by legally sufficient evidence as outlined above. For these reasons, we do not believe that the analysis from *Arrington* bears upon the circumstances present in this case.

20

jury could also have reasonably inferred based on the evidence presented at trial that any perceived danger of injury to Nutt was caused by Officer Shannon's threat to tase Nutt if he did not leave his home. During her testimony, Officer Bujnoth explained that a police officer cannot create an exigent circumstance and then take advantage of that circumstance to avoid the need for a warrant. *Cf. Kentucky v. King*, 563 U.S. 452, 469 (2011) (noting "that the exigent circumstances rule applies when the police do not gain entry to premises by means of an actual or threatened violation of the Fourth Amendment").

Moreover, evidence was presented during trial establishing that Ratliff was the chief of police, and Officer Schumacher testified that as part of Ratliff's "occupational oversight" responsibilities, he could have ordered Officer Shannon to "holster" her taser. Along those same lines, Nutt explained in his testimony that Ratliff never directed Officer Shannon to lower her weapon. Further, Officer Schumacher related that based on his investigation of the night in question and based on his own experience, there were no exigent circumstances justifying the warrantless arrest of Nutt and further testified that by entering the trailer, Ratliff "effected an illegal arrest." Accordingly, the jury could have reasonably inferred that exigent circumstances did not justify Ratliff's decision to enter Nutt's home for the purpose of subjecting Nutt to an arrest.

In light of the preceding, we conclude that there is legally sufficient evidence supporting the jury's determination that exigent circumstances did not justify the warrantless entry into Nutt's trailer to effect the subsequent arrest of Nutt.

21

*Whether Ratliff Knew the Conduct was Unlawful*

In his next set of arguments on appeal, Ratliff contends that even if the evidence established that his conduct was unlawful, the evidence was still insufficient to support his official-oppression convictions because the evidence did not establish that he knew that his actions (facilitating Nutt's arrest and committing criminal trespass) were unlawful.

As support for his assertion, Ratliff points to evidence presented at trial that he asserts indicates that he may not have known that his conduct was unlawful. For example, Ratliff stated during his interview with Officer Schumacher that he believed that there was a lawful basis for arresting Nutt. Moreover, Nutt testified that he did not know what Ratliff was told about the events before entering the home and described Officer Harden as a liar. Further, although the body-camera recording captures an extensive interaction between Officers Harden and Shannon and Nutt, Ratliff is not seen on the recording until near the end when he enters Nutt's home. Additionally, the recording captures Officer Harden stating that Nutt had run into his home after being outside. In light of the preceding, Ratliff insists that there was insufficient evidence establishing that he knew that he was subjecting Nutt to an unlawful arrest or that he was knowingly committing the offense of criminal trespass.

However, other evidence was also introduced that could have allowed the jury to reasonably infer that Ratliff was present for and witnessed a large portion of the exchange and knew that his behavior was unlawful. For example, Schutte testified that she observed Ratliff arrive on the scene shortly after Officer Shannon did. Additionally, Britton recalled that although Ratliff arrived minutes after Officer Shannon did, Ratliff was standing behind Officer Shannon and Officer Harden "watching everything" before walking into Nutt's trailer. Officer

22

Schumacher also testified that when he interviewed witnesses for this case, several witnesses explained that Ratliff was present for most of the exchange recorded on Officer Shannon's body camera even though he is only seen on the recording near the end. Further, Nutt testified that he did not give any of the police officers permission to enter his home, that he told Ratliff that he did not want to leave his home before Ratliff directed him out, that Ratliff did not ask any questions of the other officers before entering the trailer, and that Ratliff did not ask permission to enter.

In addition, the body-camera recording showed a lengthy exchange between Nutt and Officers Harden and Shannon in which the officers repeatedly ordered Nutt to leave his home and then threatened him to force him to comply. But the recording never shows that either officer entered the home. In her testimony, Officer Bujnoth explained that based on her review of the body-camera recording, it appeared that Officers Harden and Shannon were not entering Nutt's home because they understood that they did not have legal authority to do so.

Moreover, as discussed earlier, Ratliff admitted that he read Officer Harden's offense report, which contained significant omissions regarding that evening's events that would have undermined the legality of Nutt's arrest, and the evidence discussed in the prior issue was sufficient to establish that Ratliff initialed the report as the supervising officer. Regarding the report, Officer Bujnoth stated that "if all the elements of the incident had been included in the report[,] it would have been obvious that the arrest was illegal," and Officer Schumacher explained that he could not think of a reason why Ratliff would not ensure that the report accurately chronicled the events on the night in question if he genuinely believed that the arrest was legal. *Cf. Hedrick v. State*, 473 S.W.3d 824, 830, 831 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (explaining that evidence showing "[a] consciousness of guilt is perhaps one of the

23

strongest kinds of evidence of guilt" and that evidence regarding defendant's conduct after commission of crime can indicate consciousness of guilt); *Bryan v. State*, 990 S.W.2d 924, 928 (Tex. App.—Beaumont 1999, pet. ref'd) (noting that "[e]vidence of attempts to suppress or fabricate evidence proves consciousness of guilt").

Further, Ratliff admitted on the recording of his interview with Officer Schumacher that he was responding to Officer Harden's request for additional backup, and Officer Schumacher testified that it was logical to conclude that if Ratliff heard that request, he also heard Officer Harden's explanation that Nutt was inside his trailer and would have concluded that there were no exigent circumstances. Consistent with that assertion, Officer Schumacher explained that during his investigation he discovered that there were no phone calls between Ratliff and Officer Harden during the relevant time and that Ratliff did not communicate with Officer Harden through a police radio.

Moreover, Officers Schumacher and Bujnoth both provided testimony regarding training that Ratliff had had in the area of arrests, searches, and seizures. In particular, Officer Schumacher testified that all police officers are required to go through legal training every two years regarding changes in the law, that Ratliff had an advanced peace officer's certificate, that Ratliff was current on his continuing education requirements at the time of the offense, and that Ratliff previously took a course on the law regarding arrests, searches, and seizures. Similarly, Officer Bujnoth testified that all police officers "are trained under the U.S. Constitution, the Texas Penal Code, and the Texas Code of Criminal Procedure," including training on the law of searches and seizures, and that changes to any governing law are incorporated into the required law-enforcement training. Further, Officer Bujnoth explained that officers pursuing advanced certificates receive training on the Fourth Amendment and the Texas Constitution. During

24

Officer Schumacher's testimony, a list of law-enforcement-training courses that Ratliff had previously taken, including courses on arrests and seizures as well as state and federal law updates, was admitted as an exhibit.

Regarding the evidence pertaining to his training, Ratliff contends that the Court of Criminal Appeals has determined that the kind of testimony offered by Officers Schumacher and Bujnoth relating to law-enforcement training for searches, seizures, and arrests cannot serve as a basis for implying or inferring knowledge on behalf of a defendant charged with official oppression that his conduct was unlawful. As support for this proposition, Ratliff points to *Reynolds v. State*, 543 S.W.3d 235 (Tex. Crim. App. 2018), and to *Ross v. State*, 543 S.W.3d 227 (Tex. Crim. App. 2018). Further, Ratliff argues that in those cases, like the present case, no witness testified that the type of training received actually involved circumstances similar to those which the defendants ultimately faced. Moreover, Ratliff maintains that the evidence in *Ross* and *Reynolds* was deemed insufficient even though the testimony came from an individual who was familiar with the training given to Ross and Reynolds, that neither Officer Bujnoth nor Officer Schumacher were familiar with Ratliff's specific training, and that there was no testimony presented regarding the contents of the courses that he had taken. Accordingly, Ratliff contends that the testimony from Officers Schumacher and Bujnoth simply amounted to assertions that Ratliff should have known that his conduct was unlawful, which Ratliff contends is insufficient under *Ross* and *Reynolds* to satisfy the knowledge requirement for official oppression.

We find *Ross* and *Reynolds* to be distinguishable. In *Ross*, a trial court "issued an Order in Aid of Investigation" under the Family Code authorizing the Department of Family and Protective Services to enter the home of a newborn child to examine the home where the child

25

was supposed to be living and to locate the child "by any means necessary," "to search 'the premises' to locate the newborn," and to "observe 'where the alleged abuse or neglect occurred.'" 543 S.W.3d at 230-31, 235. Under color of that order, Ross entered a home accompanied by police officers, flipped over a mattress in a bedroom revealing "a large stain of blood and bodily fluid," "opened kitchen cabinets and drawers," and instructed a police officer to look inside a crockpot inside the kitchen. *Id.* at 231. After a coworker complained about the search of the kitchen, Ross was charged with official oppression. *Id.* As part of its case, the State called a "Training Academy Manager for the Department" who testified that employees for the Department are given training regarding searches, seizures, and the Fourth Amendment. *Id.* at 232. Following trial, Ross was convicted. *Id.* at 233.

When concluding that the evidence was legally insufficient, the Court of Criminal Appeals explained, among other things, that the Order in Aid of Investigation broadly authorized the Department to act "by any means necessary," to search the premises, and to observe where abuse or neglect could have occurred in the home, that the training on the Fourth Amendment "did not address this type of" atypical "fact situation," and that even if the training "had addressed this situation, that information would not have been sufficient to demonstrate beyond a reasonable doubt that Ross knew her conduct was unlawful" given the circumstances indicating that the child was in danger and that "abuse and neglect" could have taken "place throughout the entire home." *Id.* at 235.

In *Reynolds*, a fifteen-year old (A.K.) was placed in the custody of the Department, and her cell phone was confiscated. 543 S.W.3d at 237. Reynolds supervised the case and was subsequently charged with official oppression for seizing and searching A.K.'s phone. *Id.* at 237, 238. One of the State's witnesses was the same training manager from *Ross*

26

who testified regarding Fourth Amendment training provided to Department employees regarding "privacy rights of the Department's clients" and regarding Fourth Amendment training that Reynolds was given. *Id.* at 238-39.

When addressing the sufficiency of the evidence establishing that Reynolds knew that her conduct was unlawful, the Court of Criminal Appeals noted that A.K. was placed in the custody of the Department under a statutory provision authorizing the Department to take emergency possession of a child without a court order, *id.* at 241, and that there was no governing case law or statute specifying "the Department's rights and duties during the brief window of time that the child is in the Department's emergency possession," *id.* at 242. Accordingly, the Court of Criminal Appeals determined that it was not unreasonable for Reynolds to believe that she had the authority to confiscate the phone in those circumstances to prevent A.K. from engaging "in self-destructive behavior" and that the evidence was insufficient to support a determination that Reynolds knew that her conduct was unlawful. *Id.* at 242, 243.

As an initial matter, we note that the Court of Criminal Appeals did not determine that evidence regarding a police officer's or another public servant's training could not be considered when determining whether a defendant was guilty of official oppression in circumstances different from those present in *Ross* and *Reynolds*. Moreover, in the current case, Ratliff was neither acting under the authority of a court order authorizing the effectuation of emergency action by any means necessary nor confronted with an atypical search-and-seizure circumstance in which evidence of a crime may have been found throughout the home, and Ratliff was not seeking to take Nutt into custody or seize his property under the authority of a statute that did not clearly define what actions were permissible or that had no governing case law setting out the parameters for the search or seizure. Instead, in this case, Ratliff was

27

confronted with the situation of evaluating the propriety of a warrantless entry and arrest in light of the language of a statutory provision clearly prohibiting, with certain exceptions, the warrantless arrest of an individual in his home, *see* Tex. Code Crim. Proc. art. 14.05, and sufficient evidence was presented to support the jury's determination that the arrest of Nutt and entry into his home was not warranted by an exception to that mandate. Furthermore, in this case, evidence beyond the testimony pertaining to Ratliff's training was presented at trial from which the jury could have determined that Ratliff knew that the arrest of Nutt and the entry into Nutt's home were unlawful.

For the reasons previously stated, we must conclude that there was sufficient evidence establishing that Ratliff knew that his decisions to enter Nutt's trailer and to subject Nutt to an arrest were unlawful when he undertook them. *Cf. Castellano v. State*, 810 S.W.2d 800, 807 (Tex. App.—Austin 1991, no pet.) (explaining that "[k]nowledge can be inferred from the conduct of and remarks by the accused and from circumstances surrounding the acts engaged in by the accused").

*Witnessing an Offense*

In his final set of arguments in his first issue, Ratliff contends that the evidence was insufficient to support his convictions for official oppression because the evidence established that he witnessed Nutt commit the offense of resisting arrest, *see* Tex. Penal Code § 38.03, which authorized him to make the warrantless arrest of Nutt. Alternatively, Ratliff contends that the evidence established that he reasonably could have believed that Nutt committed the offense of resisting arrest and that, therefore, the evidence did not establish that

28

Ratliff knew that his conduct was unlawful as required by the statute governing the offense of official oppression. *See id.* § 39.03(a).

As support for these assertions, Ratliff points to portions of the recording of his interview with Officer Schumacher in which Ratliff explained that he went to Nutt's home after hearing Officer Harden's request for backup, that he observed Officer Shannon threatening to tase Nutt when Ratliff arrived on the scene, and that it appeared that Nutt was intoxicated and was refusing the officers' instructions to come out of his home. Further, Ratliff points to the portions of the body-camera recording in which Officers Harden and Shannon expressed their desire for Nutt to step out of the trailer and in which Nutt refused to step outside and instead asked the officers to leave. Moreover, Ratliff urges that no evidence was introduced indicating that he was advised that the nature of the offense for which the officers sought to arrest Nutt. Accordingly, Ratliff contends that he witnessed Nutt committing the offense of resisting arrest or could have reasonably believed Nutt was committing that offense or another offense, which he asserts establishes that he was authorized to enter Nutt's home and foster his arrest or that he did not know that his conduct was unlawful. *See* Tex. Code Crim. Proc. art. 14.01 (authorizing police officers to arrest offender when he commits offense in presence or view of officer).

However, other evidence was also presented to the jury that supported a determination that Officer Ratliff did not witness the offense of resisting arrest and did not reasonably believe that Nutt had committed that offense. Ratliff explained during his interview with Officer Schumacher that he heard Officer Harden's request for assistance, and evidence was presented at trial indicating that when making that request, Officer Harden explained that he needed assistance to help with an individual who had committed the misdemeanor offense of public intoxication but was now inside his home. Further, Officer Harden repeatedly explained

29

on the body-camera recording that Nutt had committed the offense of public intoxication and that was why the officers wanted him to step out of the trailer, and Officer Shannon also told Nutt that he was facing a charge of public intoxication. Moreover, as discussed earlier, evidence was also presented from which the jury could have reasonably inferred that Ratliff saw much of the interaction between Nutt and the two officers. In addition, during his interview with Officer Schumacher, Ratliff explained that he believed that the officers were going to place Nutt under arrest for public intoxication if he stepped out of his trailer. Accordingly, the jury could have reasonably inferred that Ratliff had been informed of or understood the nature of the alleged offense for which Officer Harden was wanting to arrest Nutt before entering Nutt's trailer.

In addition, although the body-camera recording shows that Nutt repeatedly refused to leave his home as directed by the officers, the jury could have reasonably inferred that Nutt did not exert any force towards the officers when making those refusals as required for the offense of resisting arrest. *See* Tex. Penal Code § 38.03 (providing that individual commits offense of resisting arrest "if he intentionally prevents or obstructs a person he knows is a peace officer or a person acting in a peace officer's presence and at his direction from effecting an arrest, search, or transportation of the actor or another *by using force against the peace officer or another*"); *Finley v. State*, 484 S.W.3d 926, 928 (Tex. Crim. App. 2016) (explaining that phrase "'using force against the peace officer or another' means 'violence or physical aggression, or an immediate threat thereof, in the direction of and/or into contact with, or in opposition or hostility to, a peace officer or another'" (quoting *Dobbs v. State*, 434 S.W.3d 166, 171 (Tex. Crim. App. 2014)). In addition, although Officer Shannon briefly stated that Nutt could be facing charges for resisting arrest, the jury could have reasonably inferred that Officer Shannon was speaking about potential charges Nutt might face if he were to resist an attempted arrest. In determining

30

what weight to give to that portion of the recording, the jury was aided by other portions of the recording where Officer Shannon clarified that the charge at issue was public intoxication and where Officer Harden later explained that Nutt had not resisted arrest but *could* face that charge if Officer Harden went up the steps to arrest Nutt and if Nutt resisted.

At one point, when Officer Shannon went up the steps to observe Nutt or the contents of the home after directing Nutt to locate his driver's license, Nutt did raise his hands up and may have touched Officer Shannon, and Officer Shannon directed Nutt not to touch her; however, Officer Shannon did not say that she was approaching Nutt for the purpose of arresting him or otherwise indicate that she was about to arrest him and instead repeatedly stated at that time that she was simply asking Nutt to retrieve his driver's license.

Similarly, although Officer Harden mentioned on the recording that Nutt "threatened [him] to get out of [his] truck" before the other officers arrived, assuming that Ratliff heard that characterization, Officer Harden did not state that the threat was made in response to any statement by him that Nutt was or soon would be placed under arrest. Moreover, Officer Bujnoth explained that Officer Harden's description of Nutt's alleged statement to Officer Harden before the other officers arrived did not qualify as a threat under the circumstances. Further, Ratliff did not enter the trailer when Officer Harden related Nutt's alleged prior statement and instead entered the premises after Officer Shannon aimed her taser at Nutt. Additionally, during his interview with Officer Schumacher, Ratliff did not state that he entered Nutt's home because he witnessed Nutt resisting arrest; instead, Ratliff stated that his "basis" for entering the home was to prevent Nutt from being injured by falling out of the home if Officer Shannon tased him.

31

After viewing the recording and considering the other evidence presented at trial, the jury could have reasonably inferred that Nutt was not exerting force against any officer in an attempt to prevent the officer from arresting him, that Ratliff did not witness Nutt commit the offense of resisting arrest, and that Ratliff did not have a reasonable belief that Nutt committed the offense of resisting arrest. Accordingly, we must conclude that the evidence presented at trial was sufficient to support the jury's determinations that Ratliff's actions were unlawful because they were not justified by either observing the offense of resisting arrest or reasonably believing that Nutt had committed that offense.

Given our standard of review and in light of the record before this Court as well as the reasonable inferences that can be made from that record, we must conclude that a rational jury could have concluded beyond a reasonable doubt that while acting under color of his office as a public servant, Ratliff subjected Nutt to an arrest that he knew was unlawful and intentionally subjected Nutt to mistreatment knowing that his actions were unlawful by criminally trespassing in Nutt's home. Having determined that the evidence was sufficient to support one of the allegations in the first count of official oppression, we need not address the remaining two alternative allegations.

For these reasons, we overrule Ratliff's first issue on appeal.

**Jury Charge**

In his third issue on appeal, Ratliff contends that there was error in the portion of the jury charge setting out the definition for a "public servant." Although the charge included the statutory definition for a public servant in the abstract portion of the charge, *see* Tex. Penal Code § 1.07(a)(41), the charge then stated as follows: "A Police Officer employed by the City of

Llano, Texas is a public servant." During the charge conference, Ratliff's attorney objected to the inclusion of the statement regarding Llano police officers, but the district court overruled the objection.

On appeal, Ratliff contends that the inclusion of the statement was error because it was an impermissible comment on the weight of the evidence. More specifically, Ratliff argues that the State was required to prove as an element of its case that he was a public servant, *see id.* § 39.03, but that the statement instructing that a police officer is a public servant in the charge "removed the decision making function from the jury" and improperly focused the jury's attention on evidence supporting a finding of the public-servant element, *see* Tex. Code Crim. Proc. art. 36.14 (directing trial courts to prepare jury charge "setting forth the law applicable to the case" and "not expressing any opinion as to the weight of the evidence, not summing up the testimony, discussing the facts or using any argument in his charge calculated to arouse the sympathy or excite the passions of the jury"); *see also Brown v. State*, 122 S.W.3d 794, 802 (Tex. Crim. App. 2003) (determining that charge contained error because it "focus[ed] the jury's attention on the type of evidence that may support a finding of criminal intent"). Further, Ratliff contends that he was harmed by the inclusion because it effectively deprived him of the "right to have a jury verdict on each element unfettered by judicial intrusion and untoward direction."

When addressing an issue regarding an alleged jury-charge error, appellate courts must first decide whether there is error before addressing whether the alleged error resulted in any harm. *See Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). This Court has addressed arguments similar to those made by Ratliff regarding a nearly identically worded instruction stating that police officers are public servants, and this Court determined that the inclusion was error because the question of whether the defendant was a public servant "was a

33

question of fact to be resolved by the jury" and because the instruction "improperly focus[ed] the jury on the type of evidence that would support a finding that [the officer] was a public servant." *See McIlvennia v. State*, No. 03-14-00352-CR, 2016 WL 3361185, at *5-6 (Tex. App.—Austin June 10, 2016, pet. ref'd) (mem. op., not designated for publication); *see also Carr v. State*, No. 14-09-00322-CR, 2010 WL 2835663, at *9 (Tex. App.—Houston [14th Dist.] July 20, 2010, pet. ref'd) (mem. op., not designated for publication) (concluding that inclusion of instruction stating that police officers are public servants was error because instruction "emphasized a particular fact"). For those same reasons, we similarly conclude that the inclusion of the instruction was error here.

If an appellate court determines that there is error present in a jury charge, it must then evaluate the harm caused by the error. *See Ngo*, 175 S.W.3d at 743. The amount of harm needed for a reversal depends on whether a complaint regarding "that error was preserved in the trial court." *Swearingen v. State*, 270 S.W.3d 804, 808 (Tex. App.—Austin 2008, pet. ref'd). If no objection was made, a reversal is warranted only if the error "resulted in 'egregious harm.'" *See Neal v. State*, 256 S.W.3d 264, 278 (Tex. Crim. App. 2008) (quoting *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)). However, if the defendant made a timely objection, as in this case, reversal is required if there has been "some harm." *Ngo*, 175 S.W.3d at 743 (quoting *Almanza*, 686 S.W.2d at 171).

In this type of analysis, reviewing courts "consider (1) the entirety of the jury charge, (2) the state of the evidence, including the contested issues and weight of probative evidence, (3) the arguments of counsel, and (4) any other relevant information revealed by the trial record as a whole." *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015). Although the standard is less stringent than the analysis performed when an objection is not

made, the reviewing court must still "find that the defendant 'suffered some actual, rather than merely theoretical, harm from the error.'" *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013) (quoting *Warner v. State*, 245 S.W.3d 458, 462 (Tex. Crim. App. 2008)). If there has been an objection, a reversal is warranted when the error is "calculated to injure the rights of the defendant." *Id.* (quoting *Almanza*, 686 S.W.2d at 171).

Before stating the additional instruction regarding police officers, the definition portion of the abstract section of the jury charge correctly defined the terms "public servant" and "government" as specified in the Penal Code. *See* Tex. Penal Code § 1.07(a)(24), (41). In addition, the portion of the abstract discussing the elements of the offense of official oppression generally tracked the relevant statutory language, *see id.* § 39.03, and the application portion instructed the jury to find Ratliff guilty only if it determined beyond a reasonable doubt that the statutory elements were met. However, as set out above, the jury charge included in the definition section of the abstract an instruction specifying that Llano police officers are public servants. Although the application section generally tracks the language of the statute and lists the relevant elements of the offense set out in the abstract, the application portion of the charge repeated in the two official oppression instructions a similarly erroneous comment by asking the jury to consider whether Ratliff was acting "under color of his office or employment as a public servant, namely, a Llano Police Officer."

Accordingly, although the balance of the charge provided correct definitions for the terms at issue and generally tracked the language of the governing statutes, although the statutory definitions for "public servant" and "government" given in the charge logically include police officers, *see id.* § 1.07(a)(24), (41); *Carr*, 2010 WL 2835663, at *3, *9; *Hoitt v. State*, 28 S.W.3d 162, 165 (Tex. App.—Texarkana 2000), *pet. dism'd, improvidently granted*, 65 S.W.3d

35

59 (Tex. Crim. App. 2001), and although the additional instruction in the abstract pertaining to the definition of a public servant was arguably a "superfluous abstraction" because it was "not necessary to an understanding of concepts or terms contained in the application paragraph," *see McIlvennia*, 2016 WL 3361185, at *9-10, the language of the jury charge as a whole arguably weighs in favor of a finding of some harm given the inclusion of the erroneous instruction in the abstract and the application portions of the charge.

Turning to the arguments of counsel, we note that no argument was presented during the opening or closing arguments that Ratliff was not a public servant. On the contrary, both the State and Ratliff's attorney repeatedly referred to Ratliff as "Chief Ratliff" or described him as the chief of police for Llano during their opening statements, and as set out earlier, police officers fall within the definition of a public servant. However, when arguing in its closing that Ratliff was "acting in his capacity as chief of police of the Llano police department" at the time in question, the State also reminded the jury that the district court had previously instructed the jury that police officers are public servants. Accordingly, this factor could arguably also weigh in favor of a finding of some harm.

Regarding the evidence presented at trial, Ratliff presented no evidence that he was not a police officer or that police officers are not public servants. Moreover, several witnesses testified that Ratliff was employed as the chief of police for Llano, and Officers Schumacher and Bujnoth discussed his training and responsibilities as a police officer and as the chief. Additionally, the body-camera recording showed that Ratliff was wearing his police officer's uniform during the time relevant to this appeal. Moreover, Ratliff's defensive theories were not in any way related to "his status as a public servant (or lack thereof)." *See id.* at *10. Accordingly, given the uncontested and overwhelming evidence establishing that Ratliff was a

36

police officer and a public servant, the state of the evidence weighs strongly against a finding of some harm. *See id.*[3]

Turning to the fourth factor, nothing in our review of the record has revealed any other relevant information bearing upon our harm analysis.

In light of our resolution of the factors listed above, we conclude that the jury-charge error did not result in some harm. Although the error was repeated in the application

---

[3] The dissent contends that the third factor shows that Ratliff suffered some harm because the evidence of Ratliff's guilt was not so overwhelming as to render the error harmless. As support for this argument, the dissent points to two opinions by the Court of Criminal Appeals that we believe to be distinguishable. *See Elizondo v. State*, 487 S.W.3d 185 (Tex. Crim. App. 2016); *Reeves v. State*, 420 S.W.3d 812 (Tex. Crim. App. 2013). In those cases, the Court of Criminal Appeals determined that the third factor did not weigh in favor of a finding of no harm because the evidence of guilt was not overwhelming; however, when setting out its reasoning, the Court of Criminal Appeals noted that the appellants presented complaints regarding the inclusion of provocation instructions as limits on the self-defense instructions included in the two jury charges where self-defense was a contested issue and explained that it would not weigh in on those disputed and fact-intensive determinations. *Elizondo*, 487 S.W.3d at 209; *Reeves*, 420 S.W.3d at 820. In contrast here, the evidence pertaining to the jury instruction at issue was not disputed and overwhelmingly established that Ratliff was a public servant.

Both this Court and one of our sister courts of appeals have addressed similar issues regarding erroneous instructions stating that a police officer is a public servant. Although those cases were assessing whether there was egregious harm as opposed to some harm, both cases relied on the undisputed and overwhelming evidence establishing that the defendants were public servants when deciding that the inclusion of the erroneous instruction was not reversible error. *See McIlvennia v. State*, No. 03-14-00352-CR, 2016 WL 3361185, at *10-11 (Tex. App.—Austin June 10, 2016, pet. ref'd) (mem. op., not designated for publication); *Carr v. State*, No. 14-09-00322-CR, 2010 WL 2835663, at *9 (Tex. App.—Houston [14th Dist.] July 20, 2010, pet. ref'd) (mem. op., not designated for publication) (noting that although it was error to include instruction, instruction that police officer is public servant is "an accurate statement of the law"). Given that the issues and the evidence involved in those cases are analogous to those present here, we similarly believe that the overwhelming and undisputed evidence pertaining to Ratliff's status as a public servant weighs against a finding of harm. Moreover, although the dissent explains that it is unwilling to assume that no harm occurred and postulates that some error may have affected the jury's determination of guilt, it fails to identify any nontheoretical harm that could have resulted when the overwhelming and undisputed evidence presented at trial would not have afforded the jury the option to determine that Ratliff was anything other than a public servant during the time in question. *See Reeves*, 420 S.W.3d at 816.

portion of the charge and referenced by the State during its closing argument, the undisputed testimony and other evidence overwhelmingly established that Ratliff was a public servant, meaning that any harm that Ratliff suffered would be theoretical and not actual. Under the unique circumstance of this case, we conclude that Ratliff did not suffer some harm as a result of the jury-charge error. *Cf. id.* at *11-12 (determining that errors in jury charge, including erroneous instruction specifying that police officers are public servants, did not result in egregious harm because record contained "unquestionable evidence . . . that overwhelmingly established" that officer was public servant "as that term is statutorily defined" and because there was no "dispute about whether the evidentiary facts sufficed to demonstrate that" officer was public servant); *Carr*, 2010 WL 2835663, at *9 (concluding that inclusion of instruction specifying that police officers are public servants was not egregiously harmful because jury had to conclude beyond reasonable doubt that individual was police officer to convict, because defendant did not contest that issue, because no one controverted assertion that police officers are public servants, and because undisputed evidence showed that individual was police officer).

For these reasons, we overrule Ratliff's third issue on appeal.

## CONCLUSION

Having overruled all of Ratliff's issues on appeal, we affirm the district court's judgments of conviction.

_____
Thomas J. Baker, Justice

Before Justices Goodwin, Baker, and Kelly
   Concurring and Dissenting Opinion by Justice Kelly

Affirmed

Filed:   February 14, 2020

Publish